UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
TERESA CIPOLLONE, *et al.*,

                         Plaintiffs,                                MEMORANDUM
                                                     AND ORDER

      –against–

                                                         10 CV 175 (RML)

ARAMARK HEALTHCARE SUPPORT
SERVICES, LLC, *et al.*,

                         Defendants.
-----------------------------------------------------------------X
ARAMARK HEALTHCARE SUPPORT
SERVICES, LLC,

                         Third-Party Plaintiff,

      –against–

STONHARD, INC.,

                         Third-Party Defendant.
-----------------------------------------------------------------X
STONCOR GROUP, INC.,

                         Second Third-Party Plaintiff,

      –against–

METRO FLOORS, INC.,

                         Second Third-Party Defendant.
-----------------------------------------------------------------X

LEVY, United States Magistrate Judge:

        Defendant and third–party plaintiff Aramark Healthcare Support Services, LLC

("Aramark" or "defendant") moves for summary judgment under Fed. R. Civ. P. 56. This matter

is before me on consent of the parties, pursuant to 28 U.S.C. § 636. I heard oral argument on

December 9, 2011. (See Transcript of Oral Argument, dated Dec. 9, 2011 ("Tr.").) For the

reasons stated below, Aramark's motion is granted.

## BACKGROUND AND FACTS[1]

Plaintiffs Teresa Cipollone and Frank Cipollone ("plaintiffs") originally brought this action in New York State Supreme Court, Kings County, on December 10, 2009.  It was removed to this court on January 27, 2010 based on diversity jurisdiction.

The court assumes familiarity with the facts.  Briefly, plaintiff Teresa Cipollone ("Cipollone") was hired as a dietary worker at Staten Island University Hospital ("SIUH") in June 2001.  (Defendant Aramark's Statement Pursuant to Local Civil Rule 56.1 ("Def.'s R. 56.1"), ¶ 16.)  She was later promoted to the position of dietary aide.  (Id. ¶ 17.)  On December 20, 2006, Cipollone was working an overtime shift and was assisting with preparation of food for an SIUH function.  (Id. ¶ 1.)  Cipollone's supervisor at that time was Executive Chef Jerry Rodriguez, an Aramark employee.  (Id.)  Cipollone had agreed to work the overtime shift at

---

[1] The following facts, upon which plaintiffs' complaint is based, are undisputed or deemed admitted, unless otherwise noted.  Aramark has served and filed a Statement of Material Facts Not in Genuine Dispute, in compliance with Local Civil Rule 56.1(a).  The rule states that upon any motion for summary judgment, "there shall be annexed to the notice of motion a separate, short and concise statement . . . of the material facts as to which the moving party contends there is no genuine issue to be tried."  Rule 56.1(b) then requires the party opposing summary judgment to include "a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried."  Under Local Rule 56.1(c), all "material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless specifically controverted by . . . the statement required to be served by the opposing party."  See AAI Recoveries, Inc. v. Pijuan, 13 F. Supp. 2d 448, 449-50 (S.D.N.Y. 1998); Montalvo v. Sun Roc Corp., 179 F.R.D. 420, 421-23 (S.D.N.Y. 1998); see also T.Y. v. New York City Dep't of Educ., 584 F.3d 412, 418 (2d Cir. 2009).  In this case, plaintiffs did not submit a response to Aramark's Rule 56.1 Statement.  However, courts are given "broad discretion to overlook a party's failure to comply with local rules" and may "opt to conduct an assiduous review on the record."  Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001).  Therefore, facts that are disputed in plaintiffs' Opposition and Sur–Reply will be deemed "contested" for purposes of this Memorandum and Order.

Rodriguez's request.  (See Deposition of Teresa Cipollone, dated Mar. 31, 2011 ("Cipollone

Dep."), annexed as Ex. L to the Declaration of Joseph P. Wodarski, Esq, dated Aug. 15, 2011

("Wodarski Decl."), at 33:24–34:11.)  Rodriguez directed Cipollone to prepare cold–cut platters

for the function.  (Def.'s R. 56.1 ¶ 2.)  In order to do so, Cipollone needed to retrieve parts for the

meat–slicing machine from the dish room.  (Id. ¶ 3.)  While on her way to retrieve the parts,

Cipollone slipped and fell inside the entrance to the dish room.[2]  (Id. ¶ 4.)

Following the accident, Cipollone was taken to the SIUH emergency room and

was admitted into the hospital for three days.  (See Cipollone Dep. at 65:22–68:14.)  Cipollone

claims she sustained injuries to her back (including fracture of the T-10 vertebrae and herniation

of the L4-5 vertebrae) and right leg and foot.  (See Plaintiffs' Response to Third–Party Defendant

Stonhard Inc.'s First Set of Interrogatories, dated Mar. 3, 2011.)  She also claims that she was

bedridden for six months and that she has been unable to work since the accident.  (See

Plaintiffs' Response to Defendant Aramark's First Set of Interrogatories, dated July 27, 2010.)

Cipollone filed a workers' compensation claim following the accident and has received workers'

compensation benefits.  (Cipollone Dep. at 106:24–107:19.)

Prior to Cipollone's accident, Aramark and SIUH had entered into a Management

---

[2] Aramark filed a third–party action against StonCor Group Inc. ("StonCor," mistakenly sued as "Stonhard Inc.") seeking indemnification based upon StonCor's contract with SIUH to renovate the floor of the SIUH kitchen and dish room in the days prior to Cipollone's accident. (See Aramark's Memorandum of Law in Support of its Summary Judgment Motion, dated Aug. 15, 2011 ("Def.'s Mem."), at 2.)  StonCor, in turn, commenced a third–party action against Metro Floors, Inc. ("Metro Floors"), the sub–contractor responsible for the actual installation of the floor.  (Id.)  StonCor has not filed any submission in connection with the present motion.  Metro Floors filed a Reply in Support of Aramark's motion.  (See Metro Floors, Inc.'s Reply Memorandum of Law in Support of ARAMARK's motion for Summary Judgment, dated Sept. 29, 2011.)

Services Agreement (the "Agreement").[3]  (Def.'s R. 56.1 ¶ 5; see also Management Services

Agreement ("Agreement"), annexed as Ex. N to the Wodarski Decl.)  The Agreement states that

Aramark was to be considered an independent contractor and that neither Aramark nor any of its

employees was to "be deemed or construed [as] a common law employee, agent, partner,

fiduciary of, or co-venturer with, [SIUH]."  (Agreement at 1, "1. Scope of Management

Services.")  Under the terms of the Agreement, Aramark was responsible for providing a "Food

Service Management Program" to SIUH.  (See Agreement, Ex. "FOOD.")  SIUH was "solely

responsible for all services required for the ownership and operation of the Facilities beyond the

scope of the Management Services to be provided by ARAMARK."  (See Agreement at 1, "1.

Scope of Management Services.")  SIUH was required to use its best efforts to cooperate with

Aramark to the extent that Aramark required the active support of SIUH employees to provide

management services.  (See id. at 2, "3(b) Cooperation.")

The Agreement distinguished between two types of workers in the food services

department: (1) members of the Aramark operations team, and (2) SIUH service employees.  (See

id. at 5–6, "4. Personnel.")  Aramark was responsible for salary, benefits, insurance and other

charges (including taxes and workers' compensation premiums) for members of the operations

team.  (Id. at 5.)  Although SIUH and Aramark were to "mutually determine the number of

Service Employees necessary for the effective and efficient provision of the Management

---

[3] The copy of the Agreement that is attached to Aramark's Notice of Motion is not dated. No party has provided a specific date when Aramark's services under the Agreement commenced, although the year 2005 appears in the initial paragraph of the Agreement.  It is not disputed that the Agreement was in effect in December 2006.  At oral argument, Aramark's counsel stated that the Agreement ended at some point and that "Aramark is no longer there." (Tr. at 19.)

Services," the service employees were to be provided by SIUH.  (Id. at 5–6)  SIUH was also responsible for salary, benefits, insurance and other charges (including taxes and workers' compensation premiums) for service employees.[4]  (Id. at 6.)

Pursuant to those terms, Aramark employees supervised all SIUH employees in the food services department.[5]  (Def.'s R. 56.1 ¶ 11.)  Supervision included instruction on job functions and how to perform work, scheduling shifts, assigning daily tasks to SIUH hourly employees, and evaluating their work product.  (Id. ¶¶ 11-13.)  The Aramark staff also scheduled overtime shifts for SIUH employees.  (Id. ¶ 13.)  However, there is some dispute as to whether overtime scheduling required approval from SIUH.  (See Plaintiffs' Memorandum of Law in Opposition to Defendant/Third–Party Plaintiff's Motion for Summary Judgment, dated Sept. 21, 2011 ("Pls.' Opp."), at 5.)  Additionally, Ted Bochynski, Aramark's general manager at SIUH, participated to some extent in the hiring, discipline, and firing of SIUH hourly employees. (Def.'s 56.1 ¶¶ 6, 7.)  However, the parties dispute the degree and propriety of Mr. Bochynski's participation, particularly the extent to which union restrictions may have limited or prohibited Mr. Bochynski from firing SIUH hourly employees.[6]  (See Pls.' Opp. at 4.)

---

[4] Though referred to as "service employees" in the Agreement, the same class of workers is alternatively referred to as "SIUH hourly employees" in the parties' submissions.

[5] In December 2006, Aramark's supervisory staff at SIUH consisted of General Manager Ted Bochynski, Executive Chef Jerry Rodriguez, an assistant director of patient services, and nineteen patient service managers. (Def.'s R. 56.1 ¶ 8.)  There were approximately 127 SIUH hourly employees working as cooks, porters, and dietary aides.  (See Deposition of Ted Bochynski, dated June 7, 2011 ("Bochynski Dep."), annexed as Ex. M to the Wodarski Decl., at 13:10-18.)  There were no SIUH employees in management or supervisory positions in the food services departments.  (Def.'s R. 56.1 ¶ 10.)

[6] While at SIUH, Cipollone was a member of the 1199 SEIU United Healthcare Workers
(continued...)

Aramark argues that it was Cipollone's "special employer" at the time of the accident and, because of the exclusivity provisions in New York's Workers' Compensation Law §§ 11 and 29(6), Cippolone's remedy is limited to the benefits she received through workers' compensation.  (See Aramark's Memorandum of Law in Support of its Summary Judgment Motion, dated Aug. 15, 2011 ("Def.'s Mem.").)  Cipollone argues that Aramark has failed to establish a complete surrender of control over her by SIUH, and thus that Aramark was not her special employer.  (See generally Pls.' Opp.)

## DISCUSSION

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The function of the district court in considering the motion for summary judgment is not to resolve disputed issues of fact but only to determine whether there is a genuine issue to be tried." Eastman Mach. Co. v. United States, 841 F.2d 469, 473 (2d Cir. 1988) (citation omitted).  A genuine factual issue exists if, taking into account the burdens of production and proof that would be required at trial, there is sufficient evidence favoring the non-movant such that a reasonable jury could return a verdict in that party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The burden of establishing that no genuine factual dispute exists rests on the party seeking summary judgment.  Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994) (citation omitted).  This burden "may be discharged by

_____

(...continued)
East local union.  (Cipollone Dep. at 21:9–17.)

'showing'—that is, pointing out to the district court—that there is an absence of evidence to

support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  It is

well–settled that "[o]n a motion for summary judgment, the court is not to weigh the evidence, or

assess the credibility of the witnesses, or resolve issues of fact, but only to determine whether

there are issues to be tried."  United States v. Rem, 38 F.3d 634, 644 (2d Cir. 1994) (citations

omitted).

B. Special Employment Under New York Workers' Compensation Law

Under New York law, workers' compensation is the exclusive remedy for an

employee injured in the course of employment.  See N.Y. Workers' Comp. Law §§ 11, 29(6).

However, "[a] person may be deemed to have more than one employer for purposes of the

Workers' Compensation Law, a general employer and a special employer."  Schramm v. Cold

Spring Harbor Lab., 793 N.Y.S.2d 530, 531 (2d Dep't 2005).  "[I]t is well settled that, if an

employee elects to receive workers' compensation benefits, that employee cannot sue any

employer with which he had a 'special employment' relationship."  Smith v. Delta Int'l

Machinery Corp., No. 05–CV–5462, 2007 WL 1540958, at *4 (E.D.N.Y. May 24, 2007)

(citations omitted).  Special employment occurs when an employee "is transferred for a limited

time of whatever duration to the service of another [employer]."  Thompson v. Grumman

Aerospace Corp., 585 N.E.2d 355, 357 (N.Y. 1991).  "General employment is presumed to

continue, but this presumption is overcome upon clear demonstration of surrender of control by

the general employer and assumption of control by the special employer."  Id.  "To be entitled to

summary judgment, therefore, defendant must submit sufficient competent evidence to overcome

this presumption."  Sherman v. Reynolds Metal Co., 744 N.Y.S.2d 553, 555 (3d Dep't 2002).

Special employment status is generally a question of fact.  Thompson, 585 N.E.2d

at 357.  However, a "determination of special employment status may be made as a matter of law

where the particular, undisputed critical facts compel that conclusion and present no triable issue

of fact."  Id.  As the court in Thompson[7] explained:

> [Special Employment] cases, not surprisingly, rest on their
> particular facts.  They do not create a per se rule that a question
> of fact always exists in these cases. They do not require that the
> question of special employment inevitably go to a jury.  That is
> true here where, combined with other indicia of special
> employment, the uncontroverted record documents an employer's
> comprehensive and exclusive daily control over and direction of
> the special employee's work duties for almost a full year with the
> corresponding complete absence of any supervision or control of
> his work duties by the originating general employer.

Id.  Following Thompson, New York courts continue to hold that "[t]he most significant factor is

who controls and directs the manner, details, and ultimate result of the employee's work."

Schramm, 793 N.Y.S.2d at 532 (citing Thompson, 585 N.E.2d at 357).  Other factors include:

"who is responsible for the payment of wages and the furnishing of equipment, who has the right

to discharge the employee, and whether the work being performed was in furtherance of the

special employer's or the general employer's business."  Id.  Courts have also considered who

---

[7] Thompson is the leading New York case on the issue of special employment.  In
Thompson, the plaintiff was hired by his general employer to work for the defendant pursuant to
a "purchase order agreement."  The plaintiff claimed that under the terms of the agreement, he
was solely an employee of the general employer.  The Court of Appeals disagreed that the
language of the agreement was dispositive.  The Court relied on facts regarding the working
relationship between the plaintiff, his general employer and the defendant, and found that the
defendant was plaintiff's special employer as a matter of law.  Although the general employer
was responsible for workers' compensation, liability and unemployment insurance, and social
security withholding, the court gave greater weight to the fact that an employee of the defendant
was plaintiff's direct supervisor "who assigned, supervised, instructed, oversaw, and monitored
and directed his work duties on a daily basis."  585 N.E.2d at 358.  Additionally, the defendant
interviewed potential employees, had firing authority over those that were hired, and had
determined what the plaintiff's wages would be.

trained the plaintiff.  See Gonzalez v. ARI Fleet, LT, 922 N.Y.S.2d 142, 144 (2d Dep't 2011).

The New York Court of Appeals recently held that special employment rested on a finding of "a

working relationship with the injured plaintiff sufficient in kind and degree so that the

[defendant] may be deemed plaintiff's employer."  Fung v. Japan Airlines Co., 880 N.E.2d 845,

845 (N.Y. 2007).

 Aramark argues that it was Cipollone's special employer as a matter of law because

it "exercised exclusive control over the plaintiff's daily work activities, including when, where

and what job tasks she was to perform."  (Defendant's Reply Memorandum in Support of its

Motion for Summary Judgment, dated Sept. 30, 2011 ("Def.'s Reply"), at 2.)  Additional "indicia

of special employment" cited by Aramark include: (1) that Aramark employees filled all

supervisory roles in the food services department; (2) that there were no SIUH employees in

supervisory roles; (3) that an Aramark employee was responsible for hiring, firing, and

disciplining SIUH food service employees "in accordance with union guidelines," (4) that

Aramark provided equipment and uniforms used by SIUH food service employees; and (5) that

Cipollone was under the supervision and direction of Aramark employee Jerry Rodriguez at the

time the accident occurred.  (Def.'s Mem. at 9–10.)  Aramark further contends that the

responsibilities of the Aramark food manager, which are outlined in "Exhibit FOOD" to the

Agreement, "confirm ARAMARK's complete supervision and control of employees such as

[Cipollone]."  (Def.'s Reply at 5 (citing Agreement, "Exhibit FOOD").)

 Plaintiffs argue that SIUH "retained sufficient control and authority over

[Cipollone] such that [she] [wa]s not a special employee of . . . ARAMARK."  (Plaintiff's

Sur–Reply Memorandum of Law in Further Opposition to Defendant's Motion for Summary

Judgment, dated Oct. 13, 2011 ("Pls.' Sur–Reply"), at 1.)  Although plaintiffs admit that

Cipollone's direct supervisor was an Aramark employee, they argue that day–to–day supervision

is not dispositive.  (Id. at 2.)  Instead, they contend that the Agreement "unambiguously sets forth

that [SIUH] retain[ed] full control over its employees."  (Pls.' Opp. at 6.)  Plaintiffs argue that

many of the indicia relied on by Aramark are expressly contradicted by the terms of the

Agreement and Cipollone's deposition testimony.[8]  (Id. at 8.)  Specifically, under the terms of the

Agreement, Aramark was not to be considered a joint employer of the Service Employees.  (Pls.'

Opp. at 6; see also Agreement § 4(B).)  The same section also states that SIUH was to be

responsible for paying the salaries, taxes, benefits (including workers' compensation), and other

---

[8] Plaintiffs initially argued that the terms of the Agreement should be considered to the exclusion of all facts presented by Aramark regarding the actual working relationship between the parties.  (Pl.'s Opp. at 6 (citing Northeast Gen. Corp. v. Wellington Advertising, Inc., 624 N.E.2d 129 (N.Y. 1993), and Rooney v. Tyson, 697 N.E.2d 571 (N.Y. 1998)).)  Neither case relied on by plaintiffs involves an alleged special employer or workers' compensation claim.  Northeast General addressed the issue of whether or not a contract can implicitly create a fiduciary relationship.  Rooney analyzed whether or not an oral employment contract for no specified term should be construed as a contract for employment at will.  However, Cipollone argues that each supports her position, and that because the Agreement is unambiguous, "there is no basis for even regarding the deposition testimony or affidavit of Ted Bochynski."  (Pls.' Opp. at 6.)  Aramark argues that, according to Thompson, a provision in a contract between employers that identifies the employee as belonging to the general employer is insufficient on its own to negate the existence of a special employment relationship.  (See Def.'s Reply at 4–5 (citing Thompson,  585 N.E.2d at 357.).)  Aramark is correct that, after Thompson, New York courts do not consider the terms of an employment contract dispositive on the issue of special employment.  See Fung, 880 N.E. 2d at 845 ("[I]t is not the title of the purported 'employer' . . . that controls, but rather the actual working relationship between that party and the purported 'employee.'"); Villanueva v. Southeast Grand St. Hous. Dev. Fund Co., 829 N.Y.S.2d 459, 461 (1st Dep't 2007) ( because plaintiff was not a party to the agreement and the agreement did "not purport to define or resolve plaintiff's special employment status," it was thus not determinative on the issue of whether plaintiff was a special employee); Sherman, 744 N.Y.S.2d at 554 ("The contract [between defendant and plaintiff's general employer] does not . . . address the issue of any special employment status and is therefore neither determinative of the issue nor does it displace judicial assessment thereof.").

related charges attributable to service employees. (Pls.' Opp. at 2; Agreement § 4(B).)

Additionally, under section 4(B) of the Agreement, Aramark was to "have no authority with

respect to the wages, hours, or other working conditions" of the Service Employees. (Pls.' Opp.

at 2; Agreement § 4(B).) Accordingly, plaintiffs maintain that summary judgment is improper

because Aramark has not overcome the "presumption of retention and control" by SIUH. (Pls.'

Sur–Reply at 2–3.)

        I will examine each of the relevant factors in turn:

        1.  <u>Day-to Day Control vs. Surrender of Control</u>

        Aramark contends that there is a special employment relationship between a

plaintiff and a defendant as a matter of law where the undisputed facts show that the defendant or

the defendant's employee "assigned, supervised, instructed, oversaw, monitored, and directed

plaintiff's work duties every workday" and the plaintiff acknowledges that the defendant's

employee was his or her "supervisor." (Def.'s Mem. at 10 (citing <u>Thompson</u>, 585 N.E.2d 355));

<u>see also</u> <u>Suarez v. Food Emporium, Inc.</u>, 792 N.Y.S.2d 384, 386 (1st Dep't 2005) ("Plaintiff's

entire, undisputed work environment – his tasks, his schedule, his position in the store's

day–to–day hierarchy —  when viewed together, demonstrate as a matter of law that

[defendant's] responsibility for plaintiff's safety is, and can be, no different from its responsibility

for the safety of all its employees."); <u>Syzmanski v. Aramark Facility Servs.</u>, 747 N.Y.S.2d 123,

125 (3d Dep't 2002) ("[T]he fact remains that [plaintiff] reported each day to his direct

supervisor, one of defendant's employees, and received his assignments from such supervisor.").

Aramark argues that, under <u>Thompson</u>'s "significant and weighty" control factor analysis, it is

entitled to summary judgment because it "exercised exclusive control over [Cipollone's] daily

work activities, including when, where, and what job tasks she would perform and how she was

to perform the tasks." (Def.'s Mem. at 9.)  In fact, it is undisputed that Aramark employees were

responsible for supervising SIUH hourly employees, including instructing them on how to

perform their work, evaluating their work product, and scheduling their shifts and assignments,

including overtime.  (Def.'s 56.1 ¶¶ 11–13.)  Cipollone identified Aramark employees Ted

Bochynski and Jerry Rodriguez as her supervisors.  (Cipollone Dep. at 30:3–24.).  Additionally,

Jerry Rodriguez was actually supervising Cipollone when the accident occurred.  (Def.'s 56.1 ¶

1.)  Rodriguez had asked Cipollone to work an overtime shift for an SIUH function (id.), and he

was the person who had instructed Cipollone to prepare cold–cuts for the function.  (Id. ¶ 2.)

     Plaintiffs claim that day–to–day supervision "does not in and of itself render

Cipollone a special employee of Aramark."  (Pls.' Sur–Reply at 2.)  Although plaintiffs concede

that this factor is significant, they stress that New York cases, including those on which Aramark

relies, hold that no single factor is determinative.  (Id.); see, e.g., Thompson, 585 N.E.2d at 357

("Many factors are weighed in deciding whether a special employment relationship exists, and

generally no one is decisive.").  Plaintiffs argue that Aramark's daily supervision does not

overcome the presumption of retention of control by SIUH.  (Pls.' Sur–Reply at 2 (citing Franco

v. Caled Mgm't Corp., 903 N.Y.S.2d 512 (2d Dep't 2010); Bellamy v. Columbia Univ., 851

N.Y.S.2d 406 (1st Dep't 2008).)  According to the court in Bellamy:

> General employment is, however, presumed to continue, and
> special employment will not be found absent a 'clear demonstration
> of surrender of control by the general employer and assumption of
> control by the special employer.' Whether such a complete transfer
> of control has occurred is ordinarily a fact– sensitive inquiry not
> amenable to resolution on summary judgment. Only where the
> defendant is able to demonstrate conclusively that it has assumed

> exclusive control over 'the manner, details and ultimate result of
> the employee's work' is summary adjudication of special
> employment status and consequent dismissal of an action proper.

851 N.Y.S.2d at 408 (internal citations omitted).[9]  Plaintiffs claim that in the instant case the

terms of the Agreement – particularly the provision giving SIUH "exclusive power and authority

to hire, discipline, terminate, determine compensation and overtime of food service employees" –

make it "impossible for the Court to determine as a matter of law" that SIUH surrendered control

over Cipollone to Aramark.  (Pls.' Sur–Reply at 2-3.)  However, plaintiffs do not deny that,

whatever the terms of the Agreement, Aramark did in fact exercise control over Cipollone's daily

work duties.

With regard to the "surrender of control" issue, Aramark cites Syzmanski, 747

N.Y.S.2d 123, which acknowledges that " a presumption of general employment . . . may be

overcome only by a clear showing that the general employer has surrendered control over the

worker and such control, in turn, has been assumed by the special employer."  Id. at 124.  After

reviewing the facts, the court found that the defendant's daily supervision of Szymanski was "not

only sufficient to overcome the presumption of general employment but demonstrates, as a matter

of law, that there are no material issues of fact requiring a trial."  Id.  In light of these cases,

Aramark's day–to–supervision of Cipollone weighs heavily in favor of finding that it was her

special employer.

---

[9] In Bellamy, the court found no surrender of control where the general employer decided where the plaintiff would work on a day–to–day basis and there was no evidence to support the claim that an employee of the defendant had supervised the plaintiff.  851 N.Y.S.2d at 408. However, the court in Bellamy distinguished the facts before it from those in Suarez and Villanueva because in both of those cases the defendant's day–to–day control was "essentially admitted" by the plaintiff.  Id.  In Franco, the court found there had been no surrender of control in part because the plaintiff's direct supervisor was also an employee of the general employer. 903 N.Y.S.2d at 514.

2.  "Work in furtherance" of general employer vs. special employer

Plaintiffs argue that "a critical factor in determining whether a special employment relationship exists is whether the work being performed was in furtherance of the special employer's or the general employer's business." (Pls.' Opp. at 7 (citing Graziano v. 110 Sand Co., 855 N.Y.S.2d 203, 205 (2d Dep't 2008).)  Plaintiffs claim that because SIUH hired Cipollone in furtherance of its duty to prepare and deliver food to patients, doctors, and staff, she was working in furtherance of the hospital's business. (Pls.' Sur–Reply at 1.)  They also claim that SIUH entered into the Agreement with Aramark in furtherance of this duty.  Id.  Plaintiffs do not explain how SIUH's duty is distinguishable from Aramark's in the situation at bar.[10]

Aramark argues that "furtherance of employment" should be considered as only one of many factors and that it is not a "critical factor."  (Def.'s Reply at 6.)  The case law regarding the "furtherance of employment" factor is hardly illuminating.  For example, in Graziano, 855 N.Y.S.2d at 205, the court found that the defendant was the plaintiff's special employer without specifically addressing the "furtherance" issue.  Moreover, the cases cited in Graziano provide no guidance on what constitutes "furtherance" of one employer's work versus another's.  See Ugijanin v. 2 W. 45th St. Joint Venture, 841 N.Y.S.2d 611, 613 (2d Dep't 2007);

---

[10] In fact, one might reasonably argue that the hospital's mission is to provide medical care to its patients, and that food preparation, while necessary, is not SIUH's primary purpose.

Scharm, 793 N.Y.S.2d at 532.[11]  I therefore find that this factor does not weigh in either party's

favor.

   3.  Hiring/Firing Authority

  Aramark claims that its employees' duties at SIUH included "hiring, firing and

reprimanding of the SIUH food service employees within the food services department in

accordance with union guidelines."  (Def.'s Mem at 9.)  In his affidavit, Bochynski states that

"ARAMARK supervisors interviewed all potential new food services hires and could object to

any new hire."  (Affidavit of Ted Bochynski, sworn to Aug. 13, 2011 ("Bochynski Aff."),

annexed as Ex. O to the Wodarski Decl., ¶ 8.)  Additionally, Aramark contends that its

supervisors could "issue the oral and written warnings and reprimands, and if necessary draft the

documents and attend termination hearings with a union representative and a member of the

SIUH human resources department."  (Def.'s Reply at 3.)  Nevertheless, Aramark argues that "the

exclusive right to hire and fire is not determinative."  Id. at 4 (citing Villanueva, 829 N.Y.S.2d at

461[12]).

  Plaintiffs argue that Aramark had no authority to fire unionized SIUH employees

such as Cipollone.  (Pls.' Opp. at 4.)  They point to the Agreement, which states that SIUH was to

---

[11] Indeed, the cases that Ugijanin and Scharm cite to do not use the word "furtherance" at all.  See Alvarez v. Cunningham Assoc., L.P., 800 N.Y.S.2d 730, 731 (2d Dep't, 2005) ("relative nature of the work"); Martin v. Baldwin Union Free School Dist., 706 N.Y.S.2d 712, 714 (2d Dep't 2000) (same); Matter of Shoemaker v. Manpower, Inc., 635 N.Y.S.2d 816, 817 (3d Dep't 1987) (same); Leone v. Columbia Sussex Corp., 610 N.Y.S.2d 586, 587 (2d Dep't 1994) (whether employer had an "interest in" plaintiff's work); Cameli v. Pace Univ., 516 N.Y.S.2d 228, 229 (2d Dep't 1987) (same).

[12] In Villanueva, the court found that the defendant was entitled to summary judgment on the special employment issue, even though it was unclear whether it had the exclusive right to hire and fire plaintiff.  829 N.Y.S.2d at 461.

be responsible for "all matters with regard to recruitment, employment[,] . . . promotion, discipline and discharge." (Pls.' Opp. at 5.)

In his deposition, Bochynski testified that all SIUH employees in the food service department were union members  (Deposition of Ted Bochynski, dated June 7, 2011 ("Bochynski Dep."), annexed as Ex. M to the Wodarski Decl., at 15:13–18), and he conceded that his hiring and firing authority was subject to union restrictions.  (See id. at 15:2 –17:4.)  Additionally, Bochynski stated that the SIUH Human Resources Department had "final say" over hiring new employees.  (Id. at 18:19–24.)

In its submission, Metro Floors suggests that because Cipollone was hired before SIUH contracted with Aramark, and because Cipollone resigned and was not terminated, "considerations about the right to hire and fire are not especially germane" to this analysis. (Metro Floors, Inc.'s Reply Memorandum of Law in Support of ARAMARK Healthcare Support Services, LLC.'s Motion for Summary Judgment, dated Sept. 29, 2011, at 3.)  I agree and therefore conclude that this factor does not tip the scales in either party's favor.

4.  Overtime Authority

Aramark also argues that its authority to order overtime should be considered in evaluating the extent of its control over Cipollone.  (Def.'s Mem. at 9.)  Aramark claims that its supervisors could order overtime without approval or input from SIUH.  (Bochynski Aff. ¶ 7.)  In his deposition, Bochynski stated that the only guideline regarding overtime was to ensure that the distribution of hours among SIUH employees was "reasonable and prudent."  (Bochynski Dep. at 21:24–25.)  In addition, Cipollone stated that Jerry Rodriguez asked her to work overtime on the day of the accident.  (See Cipollone Dep. at 7:7–11.)

-16-

Plaintiffs argue that the Agreement "clearly contradicts" Bochynski's assertions regarding his authority to schedule overtime hours for SIUH hourly employees. (Pls.' Opp. at 5.) They point out that, under the Agreement, SIUH and Aramark were to "mutually determine the number of services employees necessary for the effective and efficient provision of the management services," and that Aramark was to have no authority over "wages, hours or other working conditions" of SIUH employees. (Id. at 8 (quoting Agreement at 6, ¶ 4(b).)

Plaintiffs are correct that the language of the Agreement does not appear to reflect the actual working relationship between Aramark and SIUH. However, courts have held that in that situation, the contract is not determinative. Rather, it is "the functional issues" that control. Crowley v. Larkin, Pluznick, Inc., No. 98 CV 5730, 2001 WL 210496, at *4 (E.D.N.Y. Feb. 26, 2001) (explaining that "under the case law, the dispositive issue is who controls and directs the manner, details and ultimate result of the employee's work.") Plaintiffs have presented no evidence to counter Aramark's with respect to authority to order overtime. Accordingly, there is no triable issue of fact on this point.

### 5.  Payment of Wages and Benefits

It is undisputed that SIUH was responsible for Cipollone's salary, benefits, and most other costs associated with her employment, including workers' compensation insurance. However, the general employer's payment of wages and benefits will not defeat a finding of special employment. See Thompson, 585 N.E.2d at 357 (explaining that special employment can be found "notwithstanding the general employer's responsibility for payment of wages and for maintaining workers' compensation and other employee benefits"); Szymanski, 747 N.Y.S.2d at 124 (same). This factor therefore holds little weight.

6.  Furnishing of Equipment

The parties' sole factual dispute related to equipment concerns the uniform

Cipollone wore at work.[13]  According to Aramark, SIUH hourly employees wore uniforms

provided by Aramark that did not bear any logo or emblem that distinguished them from Aramark

supervisors.  (Def.'s 56.1 ¶ 15.)  Bochynski stated that Aramark rented the SIUH employees'

uniforms—using funds from its budget with SIUH—and that the dietary aides' uniform bore an

SIUH logo.[14]  (See Bochynski Dep. at 49:3–50:20.)  Cipollone testified that her uniform bore an

SIUH logo on the arm.  (See Pls.' Opp. at 5; see also Cipollone Dep. at 132:20–23.)

The provision of a uniform is not considered highly probative of actual control.

See Bellamy, 851 N.Y.S.2d at 410.[15]  I therefore find this factor neutral at best.

7. Training

Plaintiffs argue that the fact that Cipollone was trained by her fellow SIUH

employees also indicates that she was not a special employee of Aramark.  (Pls.' Opp. at 1.)

Cipollone testified that she was trained to use the dishwashing machine by another SIUH

---

[13]  Much of the equipment in the kitchen and dish room, including the floor buffing
machine, was provided by SIUH.  (See Bochynski Dep. at 168:12–29.)  However, Aramark
provided the equipment, including cleaning supplies, used by the SIUH porters who performed
janitorial work in the kitchen, dish room and cafeteria.  (See Bochynski Dep. at 47:10–49:2.)
"Exhibit FOOD," § III(A) also identifies which party was responsible for the provision of which
supplies.  (See Agreement, "Exhibit FOOD.")

[14] In its Rule 56.1 Statement, Aramark refers to an errata sheet entry stating "no logo"
in connection with these pages.  (Def.'s 56.1 ¶ 15.)  However, no such errata sheet is
included in Aramark's submission.

[15]  But see Bynog v. Cipriani Group, Inc., 802 N.E.2d 1090 (N.Y. 2003) (citing the fact
that defendant did not provide uniforms or equipment as a factor considered in declining to find
special employment).

employee.  (Cipollone Dep. at 138:16–23.)  However, she also stated that she received some

training from Aramark employees.  Id.

Aramark argues that Cipollone's claim regarding SIUH training is a "wildly

overbroad" misquote of her deposition testimony.  (Def.'s Reply at 3.)  Aramark further claims

that it provided training to service employees when they were hired.  Id. (citing Bochynski Dep.

at 14–18).  Further, as Metro Floors points out, Cipollone was hired, and presumably trained,

before SIUH contracted with Aramark.  (Metro Floors Reply at 3.)  This element therefore is not

persuasive either way.

8.  Summary

Most of the undisputed facts indicate that Aramark employees, including Ted

Bochynski and Jerry Rodriguez, had day–to–day control over Cipollone's work duties.  Plaintiffs

concede as much in their Sur–Reply.  (See Pls.' Sur–Reply at 1–2 (stating that Cipollone "does

not deny that her immediate supervisor was an employee of Aramark.").)  According to

Thompson and its progeny, daily control is the most significant factor in determining the

existence of a special employment relationship.  While that factor is not determinative, neither is

the language of the Management Services Agreement.  Despite Cipollone's reliance on that

language, many of the terms in "Exhibit FOOD" are favorable to Aramark's argument that it had

day–to–day control over SIUH employees.  Regardless, as Judge Gershon explained in Crowley,

2001 WL 210496, the contract is not determinative when it differs from the actual working

relationship between the parties.  Moreover, what constitutes "surrender of control" or

"furtherance of work" is not well–settled; nor do the parties, themselves, agree on the meaning of

those terms.

-19-

The parties dispute Aramark's authority over hiring and firing SIUH hourly employees. From Bochynski's deposition testimony and other evidence, it appears that SIUH gave consideration to Aramark's recommendations regarding discipline and termination. (See Tr. at 3.) The extent to which SIUH employees were subject to union restrictions is unclear. As explained above, however, these factors carry little weight under the circumstances of this case.

Taking all of the relevant factors into account, I find that the record demonstrates Aramark's "comprehensive and exclusive daily control over and direction of" Cipollone's work duties for a significant period of time, "with the corresponding complete absence of any supervision or control" of her work duties by SIUH. See Thompson, 585 N.E. 2d at 357; see also Schramm, 793 N.Y.S.2d at 532 ("The most significant factor is who controls and directs the manner, details, and ultimate result of the employee's work."). Because there are no triable issues of material fact in dispute, I find that Aramark was Cipollone's special employer as a matter of law.

## CONCLUSION

For the reasons stated below, defendant Aramark's motion for summary judgment is granted. The Clerk of the Court is directed to enter judgment accordingly.

SO ORDERED.

Dated: Brooklyn, New York
       March 2, 2012

                                                      /s/
                                                ROBERT M. LEVY
                                                United States Magistrate Judge